IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN M. GOMERY,** | : | CIVIL ACTION NO. 1:07-CV-2292 |
| **Plaintiff** | : | (Judge Conner) |
| v. | : | |
| **VERSATILE MOBILE SYSTEMS (CANADA), INC.,** | : | |
| **Defendant** | : | |

## **MEMORANDUM**

This breach of contract action arises in the context of a stock purchase transaction among plaintiff John M. Gomery ("Gomery"), his fellow co-owners of a closely held business, and defendant Versatile Mobile Systems (Canada), Inc. ("Versatile"). Gomery claims that Versatile failed to reimburse capital advancements that he paid into the closely held business as required by an unwritten agreement among the parties. Versatile has filed a motion to compel arbitration (Doc. 15), invoking the arbitration clause contained in the written agreement for the sale of the company's outstanding stock. Gomery contends that the unwritten agreement is distinct from the contract governing the sale of stock, placing it beyond of the arbitration requirement. For the reasons that follow, the motion will be granted.

**I.     Statement of Facts**[1]

On March 25, 2005, Versatile entered into a share purchase agreement (hereinafter "the SPA") with Gomery and the other owners of Perfect Order Manufacturing, Inc. ("Perfect Order"), John Kelly and Terry Johnson (respectively "Kelly" and "Johnson," and collectively with Gomery, "the partners"). (Doc. 1-3 ¶ 4.) Gomery, Kelly, and Johnson owned one hundred percent of the outstanding capital stock of Perfect Order. (Id.) Negotiations for the sale were ongoing in early 2005, when the partners informed Versatile that they had collectively paid $425,000 in capital contributions into Perfect Order in addition to their stock ownership. (Doc. 18, Ex. A ¶ 3.) Gomery's share of the capital contribution was $141,666.66, one-third of the total. (Doc. 1-3 ¶ 5.) Versatile agreed to repay these capital contributions but stated that the repayment obligation would not appear in the SPA and would instead be governed by an ancillary agreement. (Doc. 18, Ex. A ¶ 6.) Gomery testified that by February 2005 all parties to the SPA recognized that repayment of the capital contributions was an essential component of the Perfect Order acquisition:

---

[1] In accordance with the standard of review on a motion to compel arbitration, the court will present the facts in the light most favorable to plaintiff, as the non-moving party. See infra Part II.

> Q. . . . I take it that at this point in time, in late February [2005], there was no question in your mind that the acquiring entity had agreed to pay both sums, 400,000[2] and 425,000?
> A. Absolutely no question.
> Q. No backing off on the issue or no question about it; is that correct?
> A. I expressed to [Versatile's chief executive officer] that it was a deal breaker; *if this was not done, then we would not go forward and sign the definitive agreement.* I mean it was part of the deal.

(Doc. 17, Ex. D at 63-64 (emphasis added)). At the end of February 2005, Versatile's chief financial officer sent an email to Gomery representing that Versatile "will prepare the letter dealing with the [capital repayment obligation] right away." (Id. at 63.) Gomery testified that this email "confirmed we were moving forward with the side agreement." (Id.)

The parties executed the SPA on March 25, 2005. (Doc. 17, Ex. A at 1.) The agreement does not discuss the capital contributions, and the parties did not simultaneously enter an ancillary agreement addressing the issue. The SPA contains an arbitration clause that provides, *inter alia*, as follows:

> **Arbitration.** Except as otherwise set forth in this agreement, if any dispute, disagreement, difference or question shall *arise out of or in connection with this Agreement*, such dispute, disagreement, difference or question shall be referred to and determined by a single arbitrator appointed pursuant to the International Arbitration Rules of the American Arbitration Association. Every award or determination of any such arbitrator shall be final and binding on the Parties and there shall be no appeal therefrom. . . .

---

[2]The $400,000 represents deferred compensation that Versatile agreed to disburse to Johnson. Like the capital repayment obligation, this liability does not appear in the SPA. (See Doc. 17, Ex. D at 65; Doc. 18, Ex. A ¶ 5.)

(Doc. 17, Ex. A ¶ 11(o), at 63 (emphasis added)).  The SPA prescribed a closing date of April 19, 2005.  (Id. ¶ 2(e), at 12.)

The unwritten capital repayment obligations continued to preoccupy the parties following execution of the SPA.  On April 4, 2005, Versatile's board of directors met to ratify the SPA.  Minutes of the meeting reflect that, in addition to approval of the SPA, the company "has also agreed to repay $425,000 of capital contributions" to the partners.  (Doc. 18, Ex. B.)  On April 18, 2005, Versatile sought to memorialize the capital repayment obligation by sending the partners a letter agreement (hereinafter "the April 18 letter") that read, in pertinent part, as follows:

> [The parties to the stock purchase agreement] understand the following:
>
> * * *
>
> (b)   In January 2005 [the partners] advanced Perfect Order, Inc. the sum of US$425,000 (the "Contribution").
>
> Now, therefore, in consideration of the premises and the mutual promises, representations, warranties, and covenants herein contained, and intending to be legally bound, the parties agree as follows:
>
> * * *
>
> 2.   Promptly following Closing, Perfect Order will reclassify the Contribution as an advance from [the partners].
>
> 3.   Perfect Order Acquisition Corporation[3] agrees to repay the Advance to [the partners] on the earlier of:

---

[3]Perfect Order Acquisition Corporation is an acquisition subsidiary formed by Versatile to effectuate the merger.  (See Doc. 17, Ex. A preface, at 1.)

4

      (a)      The 10th day following the closing of the second equity financing by Versatile Mobile Systems (Canada) Inc. completed after the Closing Date for the Transaction and in which aggregate net proceeds of greater than Cdn$500,000; or

      (b)      November 30, 2005.

(Doc. 17, Ex. C preface & ¶¶ 2-3.) Gomery, Kelly, and Johnson signed this agreement and returned it to Versatile. (Doc. 18, Ex. A ¶ 8.) However, it is unclear whether Versatile's management signed the agreement, and an executed copy thereof was not incorporated into the closing documents. (Id.) No signed copy appears in the record.

      Gomery contends that Versatile never executed the April 18 letter and that its capital repayment obligations are therefore governed by the unwritten capital repayment agreement (hereinafter "the CRA") reached during the parties' contract negotiations. He commenced the instant action in the Court of Common Pleas of Cumberland County, Pennsylvania, alleging claims for breach of the CRA and promissory estoppel. Versatile removed and has filed a motion to compel arbitration (Doc. 15) on the ground that the parties entered the alleged CRA in connection with the SPA, bringing it within the scope of the latter's arbitration clause. Gomery responds that the two agreements are distinct and that Versatile therefore cannot export the SPA arbitration clause into the instant dispute arising from the CRA. The parties have fully briefed these issues, which are now ripe for disposition.

**II.     Standard of Review**

Granting a motion to compel arbitration effects a "summary disposition of the [factual] issue" of the existence of an agreement to arbitrate, and, for this reason, courts should consider the facts in the light most favorable to the nonmoving party, giving that party "the benefit of all reasonable doubts and inferences that may arise." Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 & n. 9 (3d Cir. 1980), quoted with approval in Sandvik AB v. Advent Int'l Corp., 220 F.3d 99, 106 (3d Cir. 2000). In the context of such a motion, the court may consider the pleadings, documents of uncontested validity, and affidavits or depositions submitted by either party. See id. (citing FED. R. CIV. P. 56(c)).

**III.    Discussion**

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, provides a framework for the implementation of private arbitration agreements and establishes a strong presumption in favor of arbitration. Sandvik AB v. Advent Int'l Corp., 220 F.3d 99, 104 (3d Cir. 2000). When adjudicating a motion to compel arbitration, the court must address two issues: (1) whether the parties have entered into a valid written agreement to arbitrate, and (2) whether the dispute in question falls within the scope of that agreement.[4] Nationwide Mut. Ins. Co. v. Cosenza, 258 F.3d 197, 202 (3d Cir. 2001); 9 U.S.C. § 2 (addressing the validity, irrevocability, and enforcement

---

[4] The parties do not dispute the validity of the SPA's arbitration clause; hence, the sole issue before the court is whether the SPA's compulsory arbitration requirement subsumes the dispute regarding the CRA.

6

of written agreements to arbitrate). Absent language in the parties' agreement clearly providing otherwise, the arbitrability of a dispute is a question of law for the court to determine. U.S. Small Bus. Admin. v. Chimicles, 447 F.3d 207, 209 (3d Cir. 2006); General Electric Co. v. Deutz AG, 270 F.3d 144, 154 (3d Cir. 2001). The reviewing court must apply federal substantive law to "determine[] whether an issue governed by the FAA is referable to arbitration," but the court may apply state law when assessing issues of contract formation and defenses to enforcement. Gay v. CreditInform, 511 F.3d 369, 387 (3d Cir. 2007); see also Peltz v. Sears, Roebuck and Co., 367 F. Supp. 2d 711, 717 (E.D. Pa.2005) (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985)). Federal law provides that, when an arbitration agreement exists, the court should compel arbitration "unless it may be said with *positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Trippe Mfg. Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005) (quoting AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 650 (1986) (emphasis in original)).

This presumption of arbitrability is particularly strong when the parties contractually agree to an arbitration provision broadly encompassing all disputes "relating to" or "in connection with" the agreement. AT & T, 475 U.S. at 650; see Battaglia v. McKendry, 233 F.3d 720, 725 (3d Cir. 2000) ("This presumption of arbitrability is particularly applicable where the arbitration clause at issue is broad.") Courts have given significant breadth to such clauses and extended them

to oral agreements that are conceptually adjacent to the written contracts in which they appear. See, e.g., Becker Autoradio U.S.A. v. Becker Autoradiowerk GmbH, 585 F.2d 39, 45 (3d Cir. 1978) (concluding that an oral modification to the term of a written contract "ar[o]se out of" the agreement and was arbitrable under the its arbitration clause); Hearon v. AstraZenica LP, Civ.A. 02-3189, 2003 WL 21250640, at *5 (E.D. Pa. Mar. 24, 2003) (collecting cases in which courts have given wide clearance to clauses governing all disputes "relating to" an agreement); Labib v. Younan, 755 F. Supp. 125, 127, 130 (D.N.J. 1991) (holding that an employee bringing suit for breach of an oral agreement for indefinite employment was required to arbitrate because it was "relat[ed] to" the employee's written contract); Int'l Talent Group, Inc. v. Copyright Mgmt., Inc., 629 F. Supp. 587, 589, 592 (S.D.N.Y. 1986) (requiring the parties to arbitrate a dispute concerning an oral agreement for computer hardware maintenance services because the parties had executed a written software license agreement that required arbitration of all matters "relation [sic] to the subject matter" of the written agreement); cf. Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1115 (3d Cir. 1993) (determining that a clause requiring arbitration of "all controversies which may arise between" the contact signatories circumscribed plaintiff's claim that defendants acted beyond the scope of their authority under the agreement). Hence, court must assess the arbitrability of an unwritten agreement in light of the written agreement's contractual language and resolve all "doubts concerning the scope of arbitrable

8

issues . . . in favor of arbitration." Gay, 511 F.3d at 387; see also Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983).

Mindful of these principles, the court turns to the SPA arbitration clause in the present matter. The clause requires the parties to submit all disagreements that "arise out of or in connection with" the SPA to arbitration. (Doc. 1, Ex. A ¶ 11(o), at 63.) This broad, inclusive language encompasses the alleged oral CRA for at least three reasons. First, the parties executed both agreements for the singular purpose of completing the Perfect Order acquisition. Second, the partners' execution of the SPA was conditioned upon Versatile's repayment of their capital contributions, rendering the two agreements interdependent. Third, they share a common negotiation history that supports compulsory arbitration of the CRA.

A unity of purpose is the first commonality between the SPA and the CRA. Both contracts are components of a single transaction designed to transfer ownership of Perfect Order from the partners to Versatile. Each of the partners possessed two separate interests in Perfect Order: outstanding stock and capital contributions paid into the company. To purchase the partners' entire stake in Perfect Order, Versatile had to acquire both interests from each partner. The parties executed the SPA and the CRA for the shared purpose of consummating this transfer. Hence, a common objective undergirds both agreements, confirming that the parties executed them "in connection with" one another. (Id.)

Second, the interdependency between the two agreements indicates that the parties executed the CRA in connection with the SPA. While the record contains

no precise execution date for the CRA, the parties had agreed by late February 2005 that there was "absolutely no question" that Versatile would repay the capital contributions and that the partners "would not go forward and sign the definitive agreement" if it failed to do so. (Doc. 17, Ex. D at 63-64; see also Doc. 18, Ex. A ¶ 3.) The email exchange between Gomery and Versatile's CFO corroborates the parties accord with respect to the capital contributions and reflects that they "were moving forward with" the CRA.[5] (Doc. 17, Ex. D at 64.) The parties signed the SPA

---

[5]Gomery asserts that the parol evidence rule and the SPA integration clause prevent the court from considering the parties' communications prior to consummation of the SPA. (Doc. 18 at 7-8.) "The parol evidence rule states that absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." DL Res., Inc. v. FirstEnergy Solutions Corp., 506 F.3d 209, 222 (3d Cir. 2007) (quoting Galmish v. Cicchini, 734 N.E.2d 782, 788 (Ohio 2000)); Rahemtulla v. Hassam, 539 F. Supp. 2d 755, 772 (M.D. Pa. 2008). An integration clause creates a presumption that the written contract in which it appears is a fully integrated instrument. Rahemtulla, 539 F. Supp. 2d at 772-73; Pociask v. KDI Sylvan Pools, Inc., No. Civ.A. 89-3447, 1990 WL 161256, at *5 (E.D. Pa. Oct. 17, 1990). Nonetheless, a court may evaluate extrinsic evidence, including bargaining history, to determine whether contractual language is ambiguous and to clarify an ambiguous contractual term. Bethlehem Steel Corp. v. United States, 270 F.3d 135, 139 (3d Cir. 2001).

In the instant matter, neither the parol evidence rule nor the integration clause bars evaluation of the parties' bargaining history to delineate the relationship between the CRA and SPA. The CRA, as an oral, unintegrated agreement is not subject to the parol evidence rule, and reliance upon bargaining history is proper to ascertain when the parties executed it, to identify its essential terms, and to determine whether it is related to the SPA. With regard to the SPA, this analysis does not *contradict* the contract's written terms. Rather, such analysis essential to apply the SPA arbitration clause in a manner *consistent* with the parties' contractual intent. The language of the arbitration clause governing disputes "aris[ing] . . . in connection with this [a]greement" is ambiguous, and determining whether the present dispute arises in connection with the SPA is impossible absent resort to the circumstances surrounding the formation of the

following this exchange.  Hence, the CRA must have been in place prior to execution of the SPA, or Gomery, Kelly, and Johnson would not have agreed to sell their outstanding stock.[6]  The parties therefore reached an agreement regarding capital repayment with the understanding that it operated as a necessary precondition of the SPA.  The interdependence between these agreements confirms that Gomery's claim for breach of the CRA arises in connection with SPA and that this matter is subject to compulsory arbitration.[7]

---

CRA.  See Langer v. Monarch Life Ins. Co., 879 F.2d 75, 81 n.8 (3d Cir. 1989) ("[W]here an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances." (citation omitted)).  Hence, the court may evaluate the parties' negotiation history and the factual basis of the dispute to determine whether the arbitration clause applies to Gomery's claims.

[6]Versatile attempted to memorialize the CRA when it transmitted the April 18 letter to the partners.  The failed attempt to execute this letter does not impugn the validity of the CRA, however, because all parties agreed that execution of the SPA was conditioned on Versatile's reimbursement of the capital contributions.  Hence, the CRA took effect in February despite continued attempts to condense it to written form.

[7]Gomery contends that the CRA was not executed until April 4, 2005, when Versatile's board of directors approved the purchase of Perfect Order.  (See Doc. 18 at 8; see also Doc. 17, Ex. A ¶ 6(a)(xvi)).  The record, however, suggests that the parties executed the CRA in advance of this date.  The April 4 board minutes reflect that Versatile's management had entered both the SPA and the CRA prior to the meeting but do not specify precisely when a formal assent occurred.  (Doc. 18, Ex. B.)  Nevertheless, had the parties executed the CRA after the SPA, as Gomery suggests, the instant dispute would remain arbitrable.  Our sister court for the Eastern District of Pennsylvania has explained that

> controversies occurring after the date of the agreement either will
> have been engendered by the agreement governing the ongoing
> relationship between the parties, or will be addressable by reference to

Third, the common bargaining history of the CRA and SPA supports referral to arbitration.  The parties negotiated both contracts concurrently and executed the SPA with the understanding that Versatile would reimburse the partners' capital contributions.  When Versatile attempted to distill the CRA to writing using the April 18 letter, the proposed agreement conditioned capital repayment upon satisfactory closing in accordance with the SPA.  (Doc. 17, Ex. C ¶ 5.)  Gomery signed and returned the letter, though Versatile allegedly never executed it.  Nevertheless, the April 18 letter demonstrates that, following the February oral agreement regarding capital contributions, the parties continued to perceive the CRA and the SPA as two facets of one transaction.  The intertwined relationship between the two agreements—from infancy of the acquisition through attempts to draft a written Version of the CRA—confirms that Gomery's claims arise in connection with the SPA.  This connection requires that an arbitral tribunal address the present dispute in the first instance.

---

the terms of the agreement. In the former case, the controversy is said to "arise under" the agreement because there is no context other than the preexisting contractual relationship in which the controversy between the parties could have arisen.

Am. Fin. Capital Corp. v. Princeton Elecs. Prods., No. Civ.A. 95-4568, 1996 WL 131145, at *8 (E.D. Pa. Mar. 20, 1996).  Were the CPA executed after the SPA, the two agreements would retain a common purpose and identical parties, and the instant dispute would continue to arise in connection with the SPA.  Compulsory arbitration therefore remains proper.

**IV.     Conclusion**

The commonalities between the CRA and the SPA demonstrate that the parties intended to submit both contracts to a single dispute resolution procedure. In light of the greater purpose of the agreements, it is illogical to conclude that they would have subjected the SPA to compulsory arbitration while prescribing an entirely different dispute resolution procedure for the intimately related CRA. Gomery's attempts to distance the two are inconsistent with the manner in which sophisticated parties typically negotiate acquisition transactions, and the court cannot conclude with "positive assurance" that the instant dispute falls beyond the purview of the SPA arbitration clause.[8]  See Trippe Mfg., 401 F.3d at 532.  The motion to compel arbitration will be granted.

---

[8] The factual similarity between the instant matter and International Talent Group, Inc. v. Copyright Management, Inc., 629 F. Supp. 587 (S.D.N.Y. 1986) further supports the propriety of arbitration.  International Talent Group featured a written contract for licensing and design of computer software that contained an clause requiring arbitration of "[a]ny and all proceedings relation [sic] to the subject matter hereof." Id. at 589, 592 (alterations in original).  The plaintiff contended that the parties had also executed an oral agreement obligating defendant to furnish consulting services associated with the plaintiff's purchase of computer hardware. Id. at 589.  Plaintiff brought suit for breach of the oral agreement, arguing that it constituted a distinct contract outside the scope of the written agreement's arbitration clause.  The court rejected this argument on the grounds that both contracts reflected similar subject matter and were executed for the purpose of installing a new computer system at the plaintiff's place of business.  Id. at 592.  The case *sub judice*, like International Talent Group, features a broad arbitration clause coupled with two contracts concerning a single business acquisition, common subject matter, and similar negotiating history.  Hence, International Talent Group demonstrates that an alleged breach of intertwined written and oral agreements must be addressed by an arbitral tribunal if the written contract contains a broad arbitration clause.

An appropriate order follows.

   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge

Dated:		January 22, 2009

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN M. GOMERY,** | : | **CIVIL ACTION NO. 1:07-CV-2292** |
| **Plaintiff** | : | **(Judge Conner)** |
| v. | : | |
| **VERSATILE MOBILE SYSTEMS (CANADA), INC.,** | : | |
| **Defendant** | : | |

## **ORDER**

AND NOW, this 22nd day of January, 2009, upon consideration of the motion to compel arbitration (Doc. 15), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The motion to compel arbitration (Doc. 15) is GRANTED.

2. The parties are instructed to arbitrate plaintiff's claims in accordance with the Share Purchase Agreement dated March 25, 2005.

3. The Clerk of Court is instructed to CLOSE this case.

       S/ Christopher C. Conner
       CHRISTOPHER C. CONNER
       United States District Judge